# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

DAVID KLINEFELTER,

    Plaintiff,

v.

BANK OF AMERICA,

    Defendant.

Case No. C08-5341RJB

ORDER ON DEFENDANT BANK OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the court on Defendant Bank of America's Motion for Summary Judgment. Dkt. 17. The court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

## PROCEDURAL AND FACTUAL BACKGROUND

**Plaintiff's Ethnicity**. Plaintiff describes his race as "Filipino-American, German ancestry." Dkt. 18, at 9. His father is Filipino, "slightly mixed with German." Dkt. 18, at 9. In addition to English, plaintiff understands Filipino/Tagalog, and he understands and speaks Japanese. Dkt. 18, at 91.

**Plaintiff's Position at the Gig Harbor Banking Center**. Plaintiff was employed by Bank of America as a Senior Personal Banker at the Gig Harbor Banking Center from September 5, 2006 until December 13, 2006, when he was terminated. As a Senior Personal Banker, plaintiff was responsible

for selling the Bank s products and services, such as checking and savings accounts, credit cards, mortgages, and loans and investments, to in-store customers at the Gig Harbor Banking Center.

**Plaintiff's Hiring**. From June of 2005 to November of 2007, Kathleen Martin was the Bank of America recruiter for positions that included Personal Bankers. Dkt. 23, at 1. In July of 2006, plaintiff applied for the position of Senior Personal Banker for the Gig Harbor Banking Center. Dkt. 23, at 2. Ms. Martin conducted the initial review of plaintiff's resume and application to ensure that he met the minimum qualifications of the position. Dkt. 23, at 2. The Recruiting Coordinator, Laura Turczanski, conducted the basic pre-screen telephone interview with plaintiff. Dkt. 23, at 2. Ms. Turczanski scheduled plaintiff for the bank's Personal Banker Assessment, which measured a candidate's aptitude for the job. Dkt. 23, at 2. On August 16, 2006, after plaintiff passed the assessment, Ms. Martin conducted the initial telephone interview with him to determine if he would be a good fit for the offered position, or for any other open positions at the bank. Dkt. 23, at 2.

Ms. Martin stated in her declaration that she thought plaintiff was a good candidate for the Senior Personal Banker position at the Gig Harbor Banking Center. Dkt. 23, at 2. Ms. Martin stated that she scheduled plaintiff for an in-person interview with Tina Hash, then Gig Harbor Banking Center Manager, and with Michelle Nadeau, then Gig Harbor Banking Center Assistant Manager. Dkt. 23, at 2.

Ms. Hash and Ms. Nadeau believed that plaintiff was a good fit because he had banking experience and was very personable and professional. Dkt. 18-2, at 66; 18-2, at 88.

Plaintiff testified in his deposition that Ms. Martin hired him, and that he then went to the Gig Harbor Banking Center to meet with Ms. Hash and Ms. Nadeau. Dkt. 18, at 11. Ms. Martin stated in her declaration that Ms. Hash made the decision to hire plaintiff after the interview at the Gig Harbor Banking Center; that Ms. Martin informed plaintiff on August 21, 2006, by telephone, of the bank's offer of employment; and that plaintiff verbally accepted the offer shortly thereafter. Dkt. 18, at 2. Ms. Martin stated that, although she communicated the offer of employment to plaintiff, she did not make the decision to hire him; and that the decision to hire him was solely Ms. Hash's. Dkt. 23, at 2.

Plaintiff testified in his deposition that, during the interview with Ms. Hash and Ms. Nadeau, "they were a little bit shocked to see who I was." Dkt. 18, at 11. "I mean, I think it was almost a joke.

ORDER - 2

But they said, 'You're David Klinefelter,' as if my name would infer something else." Dkt. 18, at 11. Plaintiff testified that Ms. Hash and Ms. Nadeau commented on his wedding ring; and that, after he told them that he was married and that his wife was Japanese, they asked where she learned English. Dkt. 18, at 13. Plaintiff stated that they then asked where he learned English, "as if English wasn't my first language." Dkt. 18, at 14. Plaintiff stated that, during the interview, Ms. Hash and Ms. Nadeau also made comments about the city of Bremerton, where he lived and where he had previously worked.

> Q  So focusing on those comments that they may have made which you perceived to be discriminatory, can you tell me whether anything other than what you've described was said?
>
> A  Basically about Bremerton, I mean the city that I lived in. I thought that it was – well, they mentioned about gentrifying the City of Bremerton and that gentrifying is moving, you know, low income, predominantly colored people out of the City of Bremerton, and that they're happy that the residents weren't displaced in the City of Gig Harbor, and that Tacoma would be receiving them. And remember that this was all in an informal setting. But for them to, you know, mention that, you know, upon first meeting each other I thought was kind of out of line. I'd say that's pretty racist.
>
> Q  Did they specifically refer to the races of any of the people that they were talking about or were they talking generically about low income people?
>
> A  Specifically they were aware of projects that were going on in the City of Bremerton, specifically maybe the East Park location was brought up, if I recall properly.
>
> Q  Did they in this conversation about the gentrification of Bremerton talk about any specific race of any individual living in Bremerton?
>
> A  Not that I recall. I mean, maybe – you know, I can't remember at this moment.

Dkt. 18, at 15-16.

During the time that plaintiff worked at the Gig Harbor Banking Center, Ms. Hash was his manager Dkt. 18, at 17.

The bank requires that all new Personal Bankers complete a four part training course. Dkt. 19, at 2. Each course, held in Seattle, Washington, is called a "Lab" and runs one full work week, from Monday to Friday. Dkt. 19, at 2. The first course covers basic banking services, such as checking and savings accounts and credit cards. Dkt. 19, at 2. The second course covers mortgages. Dkt. 19, at 2. The third and fourth courses cover more sophisticated products such as investments and small business loans. Dkt. 19, at 2. Plaintiff completed Lab 1 and Lab 2 before he was terminated. Dkt. 19, at 2.

ORDER - 3

**Lab 1 Class.** Lab 1 was scheduled from October 2 to October 6, 2006, and Lab 2 was scheduled from October 30 to November 3, 2006.

Ms. Hash stated in her deposition that plaintiff asked her to help him obtain overnight accommodations in Seattle for Lab 1. Dkt. 18-2, at 90. The bank's market office approved the overnight stay for Lab 1. Dkt. 18-2, at 92. A bank employee apparently had approved plaintiff's family's stay at the hotel, but Ms. Hash did not know this at the time he attended Lab 1. Ms. Hash confirmed with plaintiff the amount of his per diem ($70) for meals associated with his business trip, for which he was expected to provide receipts. Dkt. 18, at 35; 18-2, at 93; 18, at 81. Because the bank's credit card was not on file at the hotel for his expenses at the time he attended Lab 1, plaintiff paid for the expenses and requested reimbursement from the bank after the Lab 1 training.

Ms. Hash stated in her declaration that she received a call in the middle of the Lab 1 course from Gene Stemp, the facilitator of Lab 1. Dkt. 19, at 3. Mr. Stemp told Ms. Hash that plaintiff brought his wife and child to stay with him in the hotel room. Ms. Hash stated that she "was shocked because the Bank does not normally permit families to stay overnight on bank-sponsored travel, and I had not authorized his family's stay." Dkt. 19, at 3. Mr. Stemp also told Ms. Hash that plaintiff had disrupted the class by bragging to his classmates that the bank had allowed his family to stay with him all week; that other bank employees questioned why they were not allowed to stay overnight or allowed to bring their families; and that plaintiff was consistently late in the morning and from returning from breaks throughout the day. Dkt. 19, at 3.

Following Lab 1, plaintiff was scheduled to work on Saturday, October 7, 2006. Plaintiff did not show up for work as scheduled, and did not call. Dkt. 18, at 73. Plaintiff was later told that bank employees had made numerous attempts to reach him by telephone. Dkt. 18, at 72. In his response, plaintiff submitted phone records that he claims show that no calls were made on October 11, 2006, from the bank to his home phone number. Dkt. 3. Plaintiff testified in his deposition that his cell phone was "inactivated" and that he did not check to see whether the bank had left messages on that cell phone. Dkt. 18, at 79.

Plaintiff stated in his deposition that he believed that his next work day after completing Lab 1 training was the Monday after he finished Lab 1, and that he had never worked a Saturday before he

ORDER - 4

started Lab 1 training. Dkt. 18, at 73. The bank's electronic time keeping system shows that plaintiff had worked on September 23, 2006, a Saturday, following a forty hour work week, before he started Lab 1 training, two weeks before his no-show on October 7, 2006. Dkt. 24, at 2 and 4-11.

On October 11, 2006, plaintiff sent an e-mail to Ms. Hash, apologizing for not showing up to work Saturday, stating that he did not realize that he had been scheduled for that day; that it was his responsibility to check the schedule; and that he did not receive the phone messages because the phone numbers he had provided as his contact numbers were "not active enough for me to check them on a daily basis." Dkt. 18-3, at 22. On October 12, 2006, Ms. Hash gave plaintiff a "Final Written Counseling - Attendance" for his no-show/no-call. Dkt. 18-3, at 24.

Following Lab 1 and before Lab 2, Ms. Hash and Ms. Nadeau met with plaintiff to give him a verbal warning regarding his tardiness, and for the meal and travel expenses for Lab 1. Dkt. 19, at 3. Ms. Hash also told plaintiff that the bank would not pay for any of his family's expenses for Lab 1 and asked plaintiff to itemize the food and travel he had consumed and incurred. Dkt. 19, at 3. Ms. Hash told plaintiff that he could not bring his family to Lab 2. Dkt. 19, at 3; Dkt. 18, at 40. She also told him that she expected him to be on time for all of his classes and to not go over his per diem allotment. Dkt. 19, at 3. Plaintiff understood that he could not bring his family to Lab 2, and that the Bank wanted the receipts that specifically indicated the expenses that he incurred for Lab 2. Dkt. 18, at 40; Dkt. 18, at 80-81.

**Lab 2 Class.** Plaintiff attended Lab 2 from October 30 to November 3, 2006. Plaintiff testified in his deposition that the bank's credit card was still not on file with the hotel to pay his expenses. Dkt. 18, at 43. "And then there was a credit card on file that came after countless attempts of me reaching them, saying there wasn't a credit card on file." Dkt. 18, at 43. The hotel charges for Lab 2, including room service and hotel meal charges, were charged directly to the credit card, and sent to corporate offices.

On November 20, 2006, after plaintiff returned from Lab 2, he provided to Ms. Hash receipts for reimbursement for Lab 2. Dkt. 1-3, at 7. Ms. Hash stated in her deposition that plaintiff had told her "that this was his full meal expenses." Dkt. 18-3, at 7. The charges for which plaintiff requested

reimbursement did not include those charges that had been made directly to the bank's credit card. Ms. Hash did not know at the time that any expenses had been charged to the bank credit card.

Ms. Hash noted that the receipts showed several entrées purchased at one sitting, food purchased when plaintiff was supposed to be in class, and a ferry receipt that showed an additional passenger on his return trip home. Dkt. 18, at 53-55; Dkt.18, at 57-58; Dkt. 18-3, at 26-41. Ms. Hash became suspicious that plaintiff had brought his family, especially because the Lab 2 facilitator (a different facilitator than she had talked to during Lab 1) had already called Ms. Hash to tell her that he had a feeling that plaintiff had brought his family. Dkt. 18-3, at 1. Ms. Hash asked plaintiff if he had brought his family; he said no. Dkt. 18-3, at 2.

The expenses for which plaintiff requested reimbursement included a receipt for a ferry ride from Seattle to Bremerton that occurred in the middle of Lab 2. Dkt. 18, at 55-56; Dkt. 18-3, at 3. Ms. Hash asked plaintiff why he had gone back to Bremerton in the middle of the week when the bank was paying for his overnight stay. Dkt. 18-3, at 3-4. Plaintiff told her that he wanted to go trick-or-treating on Halloween with his family. Dkt. 18, at 55; Dkt. 18-3, at 3-4. Ms. Hash disallowed these charges, on the basis that they were not within the bank s meal and travel policy. Dkt. 18, at 68-71. Other than these charges, Ms. Hash thought plaintiff s expenses were reasonable and did not question his other charges because she believed that these were his total meal and travel expenses for Lab 2 (approximately $ 170). Dkt. 18-3, at 4; Dkt. 18-3, at 7; Dkt. 18-3, at 42-44.

On December 5, 2006, Ms. Hash received a call from the bank's regional office about a hotel receipt that plaintiff had faxed to the regional office. Dkt. 18-3, at 4. Until that time, Ms. Hash was unaware of the amount of plaintiff s hotel expenses that had been charged directly to the bank's corporate credit card. Dkt. 18-3, at 45-46; Dkt. 18-3, at 7; Dkt. 19, at 3-4. Ms. Hash stated in her declaration that the regional office informed her that plaintiff had charged over $1400 in hotel expenses to the bank's credit card. Dkt. 19, at 4. Ms. Hash further stated,

> I immediately suspected that Mr. Klinefelter had brought his family to Lab 2. His total expenses for Lab 2 was nearly $500 more than his Lab 1 expenses and included multiple room service charges in a single day. I asked Mr. Klinefelter for the copy of the hotel receipt he had received upon checkout so that I could review the charges. Mr. Klinefelter said he would only discuss his expenses with the Bank's regional office and that he had no hotel receipt to give me. Mr. Klinefelter eventually gave me the hotel receipt, but only after I told him that I knew that he had already faxed the full hotel receipt that same day to a Bank administrative employee in the regional office.

ORDER - 6

Dkt. 19, at 4.

The hotel receipt plaintiff provided to Ms. Hash identified his room service charges only by amount and date. Dkt. 18-3, at 5.; Dkt. 18-3, at 45-46. Ms. Hash asked plaintiff for the individual receipts so the bank could itemize his bill. Dkt. 18-3, at 5. He told her that he did not have them. Dkt. 18-3, at 5. Ms. Hash called the Seattle hotel where plaintiff had stayed and requested the individual receipts from the hotel's accounting office. Dkt. 18-3, at 5. During this call, she discussed with a hotel representative the types of charges plaintiff had incurred. Dkt. 18-3, at 6. The employee informed Ms. Hash that plaintiff had charged multiple meals and drinks, including children's meals, to his bank-paid room. Dkt. 18-3, at 6. Ms. Hash requested that the regional office fax the statements to the bank. Dkt. 18-3, at 61. Ms. Hash believed that plaintiff "had lied to me about having the hotel receipt with him, and I felt that he had lied to me about the full extent of his meal expenses and having his family stay with him during Lab 2." Dkt. 19, at 4; Dkt. 18-3, at 7-8.

Plaintiff testified during his deposition that he repeatedly asked what the process was for reimbursing the bank for items that would be paid by the Bank. Dkt. 18-2, at 37.

On December 5, 2006, Ms. Hash made the decision to terminate plaintiff's employment because of a lack of trust and confidence. Dkt. 13-2, at 7-8; Dkt. 18-2, at 46. A couple of days later, the bank received the complete copy of plaintiff's individual room service receipts, including many room service orders showing two adult meals and a child's meal, a room service receipt signed by plaintiff's wife, orders of alcoholic beverages, and room service ordered and signed a few minutes before and after plaintiff's classes. Dkt. 18-3, at 26-41; Dkt. 19, at 4;. Plaintiff testified in his deposition that he was sure he had a guest with him but did not remember who it was (Dkt. 18, at 59-60); that he "had people over almost every night my cousin, my wife, my cousin, my other cousin" (Dkt. 18, at 60); and that he " had friends over from class" (Dkt. 18, at 65).

Plaintiff stated in his deposition that he believed that Ms. Hash had been avoiding him; and that he overheard his managers discussing the receipts and stating "'This is ridiculous,' and just in general saying, 'I can't believe this. Oh, my gosh. Look at what he purchased. Look how much he spent'." Dkt. 18-2, at 40. Plaintiff testified that he saw a copy of the credit card receipt from the Lab 2 hotel on a fax machine, and that he then wrote a letter to Ms. Hash on December 7, 2006. Dkt. 18-2, at 38-39,

and 41. The letter stated as follows:

> hi tina. I am writing you this letter because i feel i was discriminated and never asked my side of the story when it comes to this whole expense thing. lack of communication has lead all parties to draw their own conclusion about the whole situation. I don't know where to begin, infact, i planned on sitting down with you this morning (THURSDAY 12/07). I just wanted to say, any charges above and beyond what is allowed by regulated guidelines i have no problem in paying. I am not asking any one to cover above the allowance. Take it out of my account asap.
>     During LAB-1 there was a problem with the charging of the debit card, THUS 1300$ was charged to MY personal debit card (usbank). This time around for LAB-2, the same thing happened... it was NOT UNTIL THURSDAY NOVEMBER 2nd (my last day at training did i receive confirmation that susan faxed over the form authorizing payment on sylvias card). Following that mind set, I was PREPARED to spend a ton of % on room service, inviting over my lab-2 partners for lounge drinks and my cousin for dinner. I apologize for the balance exceeding the allotted minimum. it was not my intention to do so. As well, I submitted ALL of my recipets from training EXPECTING the back end to fine tooth it and bill me for the charges above and beyond. Hence, the position taken by district right now. i expected this!! what i didnt expect was for everyone to draw abstract conclusions about what i eat, how much i spend, so on and so forth.
>     i hate to sound so... whatever the word is, but tina i feel misunderstood and would feel it to be in OUR best interest if we sat down and worked this all out. A-L-L O-U-T. everything. please accept my sincere appologies and look forward to speaking with you. Have a productive week and see you when I get back. :)

Dkt. 18-3, at 55.

Plaintiff testified in his deposition that, on the evening of December 7, 2006, he told Ms. Nadeau and another employee that he believed he had been discriminated against. Dkt. 18-2, at 43. "I didn't call out any specifics. I just basically wanted to let them know that their overall actions made me feel I was discriminated against." Dkt. 18-2, at 43.

Plaintiff stated in his deposition that he knew he had incurred a large hotel bill, but that he expected to have the opportunity to itemize his expenses and pay back the bank any disallowed expenses. Dkt. 18-2, at 34-36. Plaintiff also testified in his deposition that he expected that he would submit all of the receipts to the bank, and that the bank would disallow any excess charges–the same way that the bank had done with his Lab 1 expenses. Dkt. 18, at 36-37. Plaintiff also admitted that he knew that there were issues and problems, or at least the perception of problems, with the expense bill when he wrote the letter to Ms. Hash. Dkt. 18-2, at 41.

Plaintiff went on vacation after he sent the letter to Ms. Hash.

Ms. Hash, who was on medical leave at the time, told Ms. Nadeau to terminate plaintiff. Dkt. 18-2, at 80-81; Dkt. 18-2, at 45. Ms. Nadeau talked by phone with Maralee Burnett from the market office, and asked Ms. Burnett to be present when Ms. Nadeau informed plaintiff that he was terminated.

Dkt. 18-2, at 80. On December 13, 2006, when he returned from vacation, plaintiff was informed that he was terminated. Dkt. 18-2, at 80-81.

**Race, National Origin, and Gender Based Comments**. Plaintiff alleges that numerous inappropriate comments were made about race, national origin, and gender during the course of his employment. It is difficult to determine from the record when and in what context each of the comments was made. Ms. Hash and Ms. Nadeau dispute that they made many or most of these comments. However, for purposes of summary judgment, the court has construed all facts in the light most favorable to plaintiff.

Plaintiff testified in his deposition that Ms. Nadeau, who is of Chinese and Caucasian ethnicity, referred to herself as Chi-Rish, and she referred to plaintiff as Fil-Erman and Germ-Ipino. Dkt. 18, at 98-99. Plaintiff stated that Ms. Nadeau made these comments over the course of two days, about seven times. Dkt. 18, at 99. Plaintiff stated that he was offended by these comments; that he told Ms. Nadeau that he was offended; and that she "just laughed at it." Dkt. 18, at 99. Plaintiff stated that the comments "just dissipated." Dkt. 18, at 99.

Plaintiff stated that, during his first week of employment at the Bank, Ms. Nadeau made a comment to plaintiff to the effect that plaintiff did not drive a "rice rocket," which plaintiff interpreted to mean that he did not drive a typical Asian car. Dkt. 18, at 100 - Dkt. 18-2, at 1. Plaintiff stated that he did not tell Ms. Nadeau he was offended by her comment. Dkt. 18-2, at 1. Plaintiff stated in his deposition that "I internalized a lot of things." Dkt. 18-2, at 2.

Plaintiff testified in his deposition that Ms. Nadeau referred to herself as "white-washed", and told plaintiff that he wasn't white-washed enough. Dkt. 18-2, at 3. Plaintiff stated that he did not talk to Ms. Nadeau to tell her that he was offended by these comments, because "I never felt that I had the rapport, and I didn't think that she ever liked me, frankly, and I never felt comfortable to approach her with anything." Dkt. 18-2, at 3.

Plaintiff stated in his deposition that, after he did not show up for work on the Saturday after his Lab 1 training, he heard Ms. Hash and Ms. Nadeau talking about what Ms. Hash had told him on the Monday after he did not show up for work. Dkt. 18, at 84. Plaintiff stated that Ms. Hash told Ms. Nadeau: "What did I tell you about those Asians? No, not you." Dkt. 18, at 82, 84.

ORDER - 9

Plaintiff stated that there were "many comments that I found offensive based on my race, based on Mexicans, if you will, I mean immigration, and the clientele that we received at the – had at the Gig Harbor Banking Center I found pretty offensive. I know they were jokes, but I mean jokes are jokes." Dkt. 18, at 85.

Plaintiff stated in his deposition that he did not receive coaching to discuss performance, concerns, and progress, but that everyone else did. Dkt. 18-2, at 6. . Dkt. 18-2, at 6.

Plaintiff testified in his deposition that Ms. Nadeau commented more than twice "about all men being dogs and not to be trusted" (Dkt. 18-2, at 17-18); that Ms. Hash commented, regarding a Christmas gift exchange, that if plaintiff's "name was picked that she would buy me a leash in reference to Michelle's comments of all men are dogs" (Dkt. 18-2, at 18-19); and that Ms. Hash once said, "Cheeks in the seats, fido," when she was telling him he needed to be in his chair (Dkt. 18-2, at 20).

Plaintiff stated in his deposition that Ms. Hash told plaintiff that he was "not in Bremerton anymore and that I work in Gig Harbor and for me to understand the demographics of what Gig Harbor is and called out by name, you know, affluent white homeowners." Dkt. 18, at 87. Plaintiff testified in his deposition that Ms. Hash made jokes about customers' immigration status, and refused to help people of races other than Caucasian. Dkt. 18-2, at 16.

Plaintiff stated that Ms. Hash would direct Asian, Thai, or Vietnamese customers to him rather than to the other personal banker, Kristella Day, who is Caucasian. Dkt. 18, at 92. Plaintiff stated that Ms. Hash once led a customer to him, stating "Try to understand her. I don't understand what she's saying. You're Asian, David, you can understand what she's saying." Dkt. 18, at 91. Plaintiff stated in his deposition that Ms. Hash said this to him fifteen or twenty times. Dkt. 18, at 92. Plaintiff stated that Ms. Day also assisted customers of minority backgrounds, including Asian customers. Dkt. 18, at 93.

**Directing Customers to Caucasian Co-Worker.** Plaintiff stated that Ms. Hash directed customers to Ms. Day, "whether in cahoots, if you will, or not that the clientele walking through the door would feel more comfortable dealing with her and not dealing with me." Dkt. 18-2, at 32. It is

difficult to determine from the record at what point during plaintiff's employment the directing/steering occurred.

Plaintiff testified in his deposition as follows:

Q Okay. So just a minute ago you said that Kriste was trying to explain why Ms. Hash was moving customers from you to her. Is that what you were starting to say?

A Yes.

Q Okay. Can you tell me what you're talking about?

A Yeah, definitely. On a specific instance that I recall vividly, the customers were taken from my desk and given to her.

Q And did she have a comment about that.

A She did have a comment about that.

Q What was it?

A I can't recall specifically. She was just trying to justify why on her side that would have happened.

Q But do you remember at all what the explanation was?

A Just that the customers would feel more comfortable speaking with her.

Q And did she say what she meant by that?

A No.

Q Did you draw any inference from her comment about what she may have intended or what she may have meant?

A Just that she understands the role that she plays in that banking center and that it would all make sense with how the customer directions were taking place there.

Q And what do you think she meant by that? Are you trying to suggest that Kriste was also saying, they'll be more comfortable with me because I'm Caucasian? I'm not sure I understand you.

A Pretty much.

Q All right. But she didn't say anything like that, she didn't use words to that effect, did she?

A On race specifically? Because there's other instances that we can bring to mind.

Q I'm just trying to understand what you understood Kriste's comment to mean. Did you take it as a reference to your race or the race of the customers?

A To my race, yes.

ORDER - 11

| | | |
|---|---|---|
| 1 | Q | What is it that she said that made you think that she was making a reference to your race? |
| 2 | A | I can't answer. |
| 3 | Q | I'm sorry. A minute ago you said something about there were other instances that you could describe. What are you talking about? |
| 5 | A | Just things that I would get reprimanded for that she wouldn't. |
| 6 | Q | Like what? |
| 7 | A | Like our daily sales numbers; right? She would say, like "There's perks to being a girl around here." |
| 8 | Q | Kriste would say that? |
| 9 | A | Yea, sure. |
| 10 | Q | What was she referring to? |
| 11 | A | Just that she can get away with things and I can't because I'm a male. |
| 12 | Q | Did you observe her getting away with things that you felt that you could not? |
| 13 | A | Yeah. |
| 14 | Q | Like what? |
| 15 | A | She was rewarded, I'll tell you that, rewarded with banker points, or whatever they're called, banker dollars, some sort of reward compensation program. |
| 17 | Q | Do you know why she received those banker dollars? Was it for good performance? |
| 18 | A | It was equal performance. We were doing the exact same thing. |
| 19 | Q | Okay. But do you know whether her sales numbers were, in fact, higher than yours? |
| 20 | A | I don't know. I can't recall. I was doing my job. |
| 21 | Q | So it sounds like what you were saying is you guys had the same jobs, but she received some maybe performance-based banker dollars, I think was the phrase you used, that you did not? |
| 23 | A | Yes. |
| 24 | Q | Do you have reason to believe that – let me ask this Do you know why she received banker dollars? |
| 25 | A | For performance. For closing deals that I was not given an opportunity to close. |
| 26 | Q | What deals? |
| 27 | A | Mortgage deals, checking account deals, things that were spoon-fed to her, frankly, and were denied to me. I wasn't given the equal opportunity to. |

| | | |
|---|---|---|
| 1 | Q | And do you know what – did she, like, buy things with these banker dollars or what were they used for, do you know? |
| 2 | | |
| 3 | A | I don't know specifically what she purchased, but I know that it was a company reward program that was pretty universal. |
| 4 | Q | Were you eligible to participate in it? |
| 5 | A | Most definitely. |
| 6 | Q | And did you also receive banker dollars? |
| 7 | A | Not a single dollar. |

Dkt. 18-2, at 22-26.

Plaintiff further explained, how the purported scheme would work:

| | | |
|---|---|---|
| A | Yeah. I can explain it. Gig Harbor is a pretty small community. Everybody knows everybody, purportedly. I'm obviously, the newcomer coming in there. So the people that walked through the doors, it's not their first time coming in. |
| | They've either been banking there for several years, they've already established some sort of rapport with the manager. And not only that, but there's a pretty brief profiling piece attached to a clipboard as to what brings you into the banking center today. |
| | They're going to tell you right away, "I just need to order a new debit card. I just need to make a deposit. I need to refinance my mortgage. I'm looking to purchase another house," things like that. |
| Q | So there's actually like almost an intake form when a customer comes in? |
| A | Most definitely. |
| Q | And is it your belief that Ms. Hash or others who were engaged in lobby-leading directed Kriste those clients who needed more – |
| A | Profitable. |
| Q | – like more profitable or financially rewarding bank products and services? |
| A | Absolutely. |

Dkt. 18-2, at 26-27.

**EEOC Complaint**. Plaintiff filed a charge employment discrimination, based upon race, sex, national origin, color, religion, and retaliation, the EEOC. Dkt. 18-3, at 57-70. The complaint alleges that the EEOC issued a Notice of Right to Sue on March 5, 2008. Dkt. 1, at 2.

**Complaint in Federal Court.** On May 29, 2008, plaintiff filed this case against Bank of America, alleging that (1) he was discriminated against on the basis of gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; (2) he was sexually harassed, in violation of

ORDER - 13

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (3) he was subjected to disparate treatment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (4) he was subjected do a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; and (5) he was retaliated against for complaining to his manager of hostile work environment and discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Dkt. 1. The complaint also references the Washington Human Rights Act, RCW 49.60.180. Dkt. 1, at 9.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect.*

ORDER - 14

*Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

DISCUSSION

**1. Hostile Work Environment**

Plaintiff contends that he was subjected to harassing comments that were racist and sexist; that the harassment consisted of more than a few isolated incidents; and that the comments occurred during a brief period of time. Plaintiff maintains that the conduct was sufficient to alter the conditions of work because he was denied extra compensation and subjected to a pretextual discharge.

To prevail on a hostile workplace claim premised on either race or sex, a plaintiff must show (1) that he was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Vasquez v. County of Los Angeles*, 349 F.3d, 634, 642 (9th Cir. 2003).

Not all workplace disputes fall within the purview of Title VII. The severe and pervasive prong ensures that only truly harassing behavior is deemed unlawful. To determine whether conduct is severe and pervasive, the court looks at the context of the alleged harassment to determine its frequency and severity, whether it is physically threatening or humiliating, and the extent to which it unreasonably interferes with the employee's work performance. *Vasquez v. County of Los Angeles*, 349 F.3d, 634, 642 (9th Cir. 2003). The working atmosphere must be both subjectively and objectively abusive. *Id.* Merely an offensive utterance is insufficient. *Id.*

The court has carefully reviewed the comments that plaintiff believes created a hostile work environment. Plaintiff's belief that Ms. Hash and Ms Nadeau were "shocked" when they saw who he was, with the name of Klinefelter, is speculation on his part. Plaintiff's belief that Ms. Hash and Ms. Nadeau's comments about gentrification of Bremerton were racist is based only upon his own assumptions and inferences. Ms. Nadeau's reference to herself as Chi-Rish, and her references to plaintiff as Fil-Erman and Germ-Ipino occurred over two days, about seven times; plaintiff did not complain about these comments to Ms. Nadeau's supervisor. Ms. Nadeau's comment about the "rice

ORDER - 15

rocket" occurred once; plaintiff did not tell Ms. Nadeau that he was offended, nor did he report the comment to Ms. Nadeau's supervisor. Plaintiff did not tell Ms. Nadeau that he was offended by her reference to herself as "white-washed" and her comment to him that he wasn't white-washed enough, nor did he report this comment to Ms. Nadeau's supervisor. Ms. Hash's comment to Ms. Nadeau about "those Asians", while inappropriate if in fact the comment was made, was not made to plaintiff and was made only one time. Plaintiff is not specific about the comments related to immigration and ethnicity or race of clients of the Gig Harbor Banking Center, and the nature of those comments is vague. Plaintiff did not complain about Ms. Nadeau and Ms. Hash's alleged gender based comments (men being dogs, men not to be trusted, "cheeks in the seats, fido", and buying plaintiff a leash), which appear to have been attempts at humor.

The comments plaintiff complains about do not rise to the level of a hostile work environment. The comments, while arguably of some frequency, were not severe; they were not physically threatening; and were not humiliating. Plaintiff rarely voiced his discomfort with the comments and did not complain to supervisors. Plaintiff has not made any showing that these comments unreasonably interfered with his work performance. Even construing all facts in favor of plaintiff, he has not shown that there is an issue of fact that would support a claim that he was subjected to a hostile work environment, and that claim should be dismissed.

**2. Discrimination Based upon Gender and Race or National Origin**

Plaintiff contends that he was terminated on the basis of gender and race or national origin, and that the reason given for his termination was a pretext for discrimination. Plaintiff also appears to claim that he was not able to make as much money as a co-worker because more affluent customers were steered away from him because of his race or national origin, or because of his gender.

In order to prevail on a Title VII claim of discrimination, a plaintiff must first establish a prima facie case of discrimination consisting of the following elements: (1) plaintiff belongs to a protected class; (2) he was performing his job according to the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other employees with qualifications similar to his own were treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Vasquez v. County of Los Angeles*, 307 F.3d 884, n. 5 (9th Cir. 2002). If the plaintiff establishes a prima facie case,

the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment decisions. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802. Once the defendant satisfies this burden, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for a discriminatory motive. *Id.* at 804.

A plaintiff may prove pretext by either direct or circumstantial evidence. *Dominguez - Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1038-39 (9th Cir. 2005). "Direct evidence is evidence, which, if believed, proves the fact of discriminatory animus without inference or presumption. Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Id.* If a plaintiff has only circumstantial evidence, that evidence must be "specific" and "substantial" evidence of pretext to survive summary judgment. *Id*.

In Washington, the state courts apply the same burden-shifting scheme to cases under RCW 49.60 as the federal courts do to Title VII cases. *Hill v. BCTE Income Fund-I*, 144 Wn.2d 172, 180-81 (2001)(adopting Title VII analysis from *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

**Termination**. Plaintiff is a man of Filipino heritage; he arguably belongs to a protected class. Plaintiff was not performing his job according to the employer's legitimate expectations when he violated company travel policies regarding reimbursement, and was less than forthright with his manager about those travel expenses. Plaintiff suffered an adverse employment action when he was terminated. However, he has not shown that other employees who submitted travel expense vouchers with the multiple unreimbursable expenses, in violation of company policy; and who were not forthcoming about those expense charges, were treated more favorably than he was. Plaintiff has not set forth a prima face case of race, national origin, or gender discrimination regarding his termination.

Plaintiff contends that Ms. Hash was not correct in assuming that he was dishonest and that he knowingly violated company policy in regard to the expenses for Lab 2; and that he was expecting to straighten everything out with the company after Lab 2. Even assuming that plaintiff is correct, that he did nothing wrong, and that he has made out a prima facie case of discrimination, defendant has shown that plaintiff was terminated for a legitimate, nondiscriminatory reason. Ms. Hash evaluated the receipts from Lab 2 and disallowed certain expenses; discovered–without plaintiff telling her--that

addition charges and unreimbursable charges had been made to the bank's credit card; and confronted plaintiff, who appeared to her to be less than truthful. Plaintiff has made no showing that the termination on the basis of his abuse of company travel policies was a pretext for race, national origin, or gender based discrimination. The court notes that Ms. Hash's alleged comment to Mis Nadeau ("What did I tell you about those Asians?") was made after Lab 1, and plaintiff was not terminated at that time. He went to Lab 2, and then worked at the bank until the issues of his Lab 2 expenses arose.

**Steering.** Plaintiff contends that he was not able to make as much money as a female Caucasian co-worker because more affluent customers were steered away from him because of his race or national origin, or because of his gender.

Plaintiff is a man of Filipino heritage; he arguably belongs to a protected class. In regard to his job as a personal banker, plaintiff was arguably performing his job according the bank's legitimate expectations. However, plaintiff has not met his burden to show that he suffered an adverse employment action, or that the other personal banker, a Caucasian female, was treated more favorably than he was. The court has quoted extensively above from plaintiff's deposition. Plaintiff's testimony about this issue was based upon speculation and inferences. Plaintiff did not testify to facts within his personal knowledge that would support this claim. Further, plaintiff has relied on no evidence other than his deposition testimony to support this claim.

Plaintiff has not made a prima facie case supporting his claim that he was discriminated against on the basis of race, national origin, or gender when more affluent clients were steered away from him to his female Caucasian co-worker. This claim should be dismissed.

**3. Retaliation**

Plaintiff claims that he was terminated after he wrote a letter to Ms. Hash, complaining of discrimination. Plaintiff also claims that he was terminated after he complained to Ms. Nadeau about discrimination.

To establish a retaliation claim under Title VII, "a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000) (*citing Payne v. Norwest Corp.*, 113 F.3d 1079 (9th Cir.1997)). At that point, "the burden of production shifts to the employer to present legitimate

reasons for the adverse employment action. Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext. Only then does the case proceed beyond the summary judgment stage." *Id.* "The causal link between a protected activity and the alleged retaliatory action can be inferred from timing alone when there is a close proximity between the two." *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004); *See e.g. Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987) (holding that sufficient evidence of causation existed where adverse employment action occurred less than three months after the protected activity); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731-32 (9th Cir.1986) (concluding that there was adequate evidence of a causal link where the retaliatory action occurred less than two months after the protected activity).

Plaintiff has shown that he made a complaint of discrimination, which is a protected activity; and that he suffered an adverse employment action when he was terminated. Plaintiff has arguably shown that his complaint of discrimination was causally connected to the decision to terminate his employment, for purposes of making out a prima facie case, because plaintiff's complaint of discrimination in the December 7, 2006 letter was made close in time to his termination.

Defendant has shown that the decision to terminate plaintiff was based upon his violation of company travel policies and his perceived untruthfulness. Defendant has therefore met its burden to show a legitimate reason for terminating plaintiff. Plaintiff, therefore, has the burden to show that the termination was a pretext for retaliating against him for complaining of discrimination. In the context of the facts of this case, plaintiff has not met his burden to show pretext. Plaintiff complained of discrimination in his e-mail to Ms. Hash on December 7, 2006, after he saw the Lab 2 credit card receipt lying on a fax machine and after he heard his managers discussing the receipts. He then wrote the letter to Ms. Hash, complaining of discrimination. At the point he wrote the letter, plaintiff knew that he was in trouble for his Lab 2 expenses. A complaint of discrimination after plaintiff already knew that he was in jeopardy does not create an issue of fact regarding pretext. Plaintiff has not met his burden to show that his termination was in retaliation for his complaint of discrimination.

Plaintiff refers in his response to comments Ms. Nadeau allegedly made to him, advising him not to complain about discrimination because he would be viewed as a liability and might be subjected to

the wrath of the company. *See* Dkt. 20, at 21. Even if these comments were made by Ms. Nadeau and were part of the record, they are not sufficient to establish retaliation. Plaintiff testified in his deposition that Ms. Hash made the decision to terminate him and Ms. Nadeau "was directed to pass this on". Dkt. 18-2, at 45-46.

Plaintiff has not set forth facts that would support a claim that he was terminated as retaliation for a protected activity. This claim should be dismissed.

**4. Conclusion**

Plaintiff has not shown that there is an issue of fact as to his claims that he was subjected to a hostile work environment; that he was discriminated against on the basis of gender, race or national origin; and that he was retaliated against; in violation of Title VII and the Washington Law Against Discrimination. Defendant is entitled to judgment as a matter of law. Defendant's motion to summary judgment should be granted and the case should be dismissed.

Therefore, it is hereby

**ORDERED** that Defendant Bank of America's Motion for Summary Judgment (Dkt. 17) is **GRANTED**. This case is **DISMISSED WITH PREJUDICE**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 15th day of July, 2009.

Robert J. Bryan
United States District Judge